IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

STEVE M. BAXTER,

        Plaintiff,

    vs.                      **Case No. 06-4038-RDR**

FARM BUREAU MUTUAL INSURANCE
COMPANY, INC., et al.,

        Defendants.

_____

<u>**MEMORANDUM AND ORDER**</u>

Plaintiff alleges a breach of an implied contract of employment. Defendants are Farm Bureau Mutual Insurance Company, Inc. and Farm Bureau Life Insurance Company, Inc. This case is now before the court upon defendants' motion for summary judgment. This case involves the termination of plaintiff as a District Sales Manager for one or both of the defendants. There appears to be some dispute or confusion regarding which "Farm Bureau" entity or entities actually employed plaintiff and other persons. This may be because of what defense counsel has termed the "intricately structured fashion" in which the Farm Bureau defendants run their business. This will be further explained, and perhaps clarified, later in this order.

In the end, we conclude that defendants are entitled to summary judgment because plaintiff was not employed by defendant Farm Bureau Life Insurance Company, Inc. and plaintiff did not have an implied contract with defendant Farm Bureau Mutual Insurance

Company, Inc.

I.   SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).   The movant has the burden to "demonstrate an absence of a genuine issue of material fact given the relevant substantive law."   Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir.) cert. denied, 506 U.S. 1013 (1992).   The court reviews the evidence and draws all reasonable inferences in the light most favorable to the nonmovant.   Thomas v. International Business Machines, 48 F.3d 478, 484 (10th Cir. 1995).   Summary judgment shall be granted unless there is evidence upon which a reasonable jury could find for the nonmovant.   Panis v. Mission Hills Bank, N.A., 60 F.3d 1486, 1490 (10th Cir. 1995) cert. denied, 516 U.S. 1160 (1996).   Conclusory allegations will not create a genuine issue of material fact defeating a summary judgment motion.   White v. York Int'l Corp., 45 F.3d 357, 363 (10th Cir. 1995).

II.   UNCONTROVERTED FACTS[1]

As stated in the Employee Guide admitted as an exhibit in this case:  "The term 'Farm Bureau' refers to a large group of separate

_____

[1] Some of the facts contained in this section may have been listed as "controverted" in the parties' pleadings.  But, the court finds that the parties were actually controverting the inference which should be drawn from the facts as opposed to the facts themselves.

2

corporations which are directly or indirectly related to or affiliated with one another through stock ownership or otherwise. Within Farm Bureau there are various employers." Doc. No. 71-9, p. 4. As stated previously, the two defendants in this case are: Farm Bureau Mutual Insurance Company, Inc. (FBM) and Farm Bureau Life Insurance Company, Inc. (FBL). Defendant FBM was created on January 1, 2003 from the merger of Farm Bureau Mutual Insurance Company of Kansas, Farm Bureau Mutual Insurance Company of Nebraska, and Farm Bureau Mutual Insurance Company of Iowa. Plaintiff did not become an employee of defendant FBM until six months after the merger, July 1, 2003. Prior to that, however, plaintiff had a lengthy history as an independent contractor for "Farm Bureau" in Kansas. In 1985, plaintiff started as an agent selling insurance. In 2001, he became a "Market Manager" in Shawnee County, which was a position involving the oversight of other agents. In July 2003, there was a reduction and consolidation in the number of Market Manager positions in Kansas. The position was renamed "District Sales Manager" and is also known as "Agency Manager." Plaintiff applied for and on July 1, 2003 received a District Sales Manager position. Unlike the Market Manager position, this was not an independent contractor position, but a position as an employee.

Defendant FBM sells property-casualty insurance products, including auto, homeowners, commercial and crop insurance, through

multi-line sales agents who sell only Farm Bureau Insurance products.   After the January 1, 2003 merger, employees of Farm Bureau Mutual Insurance Company of Kansas and Farm Bureau Mutual Insurance Company of Nebraska became employees of FBL Financial Group, Inc., an Iowa corporation.   FBL Financial Group, Inc. sold individual life and annuity products under the consumer brand names "Farm Bureau Financial Services" and "Equitrust Financial Services."   FBL Financial Group is not a defendant in this case, but it has a Management Services Agreement with defendant FBM under which it provides personnel competent to perform the management functions of FBM.   Among these personnel are persons who manage the District Sales Managers of defendant FBM.   Defendant FBM pays FBL Financial Group a management fee which includes a portion of the salaries of the FBL Financial Group employees who manage the District Sales Managers employed by defendant FBM.

FBL Financial Group also provides certain human resources functions for defendant FBM.   FBL Financial Group maintains personnel files for defendant FBM employees, processes payroll, completes new hire and termination paperwork, and ensures compliance with state and federal anti-discrimination laws. Defendant FBM and FBL Financial Group use the same Employee Guide. Employees of FBL Financial Group make employment decisions regarding defendant FBM's District Sales Managers.   They also supervise and evaluate defendant FBM's District Sales Managers.

4

But, FBL Financial Group's <u>Human Resources Department</u> does not evaluate the performance of the District Sales Managers, or dictate who defendant FBM may hire or fire as a District Sales Manager, or dictate the terms upon which a District Sales Manager is hired or fired.

Defendant FBM is not a subsidiary of FBL Financial Group.  It is a mutual insurance company, owned by its policyholders, which has a Management Services Agreement with FBL Financial Group.

Defendant FBL is a wholly-owned subsidiary of FBL Financial Group.  Defendant FBL sells life insurance and related products through a network of agents who work as independent contractors. Defendant FBL has no employees.

Plaintiff's W-2 forms indicate that he received employment income from defendant FBM.  Plaintiff also received "override commissions" from defendant FBL for the sales of life insurance in his district.  An "override commission" is the District Sales Manager's percentage of the commission that an agent earns in making a sale.  Defendant FBL issued an IRS Form 1099-MISC to plaintiff for the years 2004 and 2005.

Plaintiff did not have a written contract of employment with defendant FBM or defendant FBL at the time he was a District Sales Manager.  Plaintiff received a copy of the Employee Guide when he became a District Sales Manager for defendant FBM.  He read the Employee Guide.  The Employee Guide contains the following

disclaimer which is printed on its cover and 28 of its 30 pages:

> NEITHER THE PROVISIONS OF THIS EMPLOYEE GUIDE NOR ANY
> OTHER DOCUMENT OR PUBLICATION ESTABLISHES A CONTRACT OF
> EMPLOYMENT BETWEEN YOU AND FARM BUREAU.   Accordingly,
> neither Farm Bureau nor its employees is committed to any
> employment relationship for a fixed period of time and
> the right of either party to terminate the relationship
> is not limited by a contractual commitment.

The Employee Guide contains a discussion of circumstances under
which termination may be appropriate, such as sexual harassment,
illegal discrimination, substance abuse or the violation of a "no
weapons" policy.  But, it does not contain any policy addressing
termination, discipline or probation for performance reasons.

Nobody told plaintiff that defendant FBM had a policy of
giving its District Sales Managers an opportunity to correct
performance deficiencies before their employment was terminated.
No one told plaintiff that he would be terminated only for cause or
that his employment would continue from year to year or be for a
specified duration.   Plaintiff, however, through his long
experience with Farm Bureau, thought that defendant FBM had an
unwritten policy of affording their employees notice and an
opportunity to correct performance deficiencies, including a
probationary plan, prior to terminating their employment.  No one
told plaintiff that this alleged policy had changed.  Plaintiff
admits that there is no written policy to such effect.

D.C. Couch and Mark Bourgeois were District Sales Managers who
were fired from their jobs at defendant FBM.  There is no evidence

that D.C. Couch was given a written performance plan prior to his termination, although he had opportunities to correct his performance shortcomings and had goals set for him.  Couch was not surprised by his termination.

Mr. Bourgeois was terminated by Mr. Larry Riley, who was the Regional Vice President for FBL Financial Group.  Mr. Riley did not give Mr. Bourgeois a performance plan or probationary plan prior to terminating Mr. Bourgeois.   Mr. Bourgeois was not fired for performance reasons.   He was both hired and fired in 2006, approximately one year after plaintiff was terminated.

Every contract plaintiff has signed with a Farm Bureau company has contained language allowing the company or the agent the right to terminate the contract at any time without notice.  Plaintiff believed that the policy of Farm Bureau companies was to reserve termination without notice to situations involving fraudulent or unethical behavior.  When plaintiff was an independent contractor insurance agent in the mid-1990s and served on the Agents Nonperformance Committee, no agents' contracts were terminated for performance reasons.  His history with Farm Bureau led him to believe that agents or employees with performance problems were given notice and an opportunity to improve or correct deficiencies prior to termination.

While plaintiff was employed as a District Sales Manager, no employees reported to him.  Consequently, he did not terminate any

employees while working as a District Sales Manager.

As District Sales Manager, plaintiff reported directly to Don Thomas, Director of Agency for FBL Financial Group.   Thomas reported directly to Randy McCracken, who served as the Regional Vice President for FBL Financial Group.   McCracken and plaintiff had known each other and worked in association with each other for a number of years.   Their wives were friends.   McCracken reported to Roland Schobert and Bob Gray, who were vice-presidents with FBL Financial Group.

As a District Sales Manager, plaintiff was responsible for recruiting new agents, driving productivity for insurance sales goals, and meeting recruitment goals within his district.   He had the responsibility to increase life insurance sales and conversion of existing accounts for property and casualty insurance into an insurance policy with defendant FBM as it existed after the 2003 merger.   There was an emphasis on increasing life insurance production, but this was difficult in plaintiff's district because the sales agents lacked life insurance experience.   Plaintiff worked with agents in his district to solicit insurance contracts and to set annual production goals for life insurance.

Although plaintiff's district increased its life insurance production each year while plaintiff was District Sales Manager, plaintiff's district failed to meet its goals for life insurance production and conversions.   The total life production was less

than the annual goal for 2004.  In the first part of 2005, monthly life production goals again were not met.  Goals for conversions also were not met in 2004 and 2005.  Nevertheless, plaintiff received multiple awards and letters in support from his supervisors, right up to the date of his termination.

Don Thomas was dissatisfied with plaintiff's performance as a District Sales Manager.  He had regular discussions with plaintiff and encouraged increased production.  Randy McCracken felt that plaintiff's performance dipped down in 2003, perked back up in some areas in 2004 and then dropped off again in some areas in 2005.  In a 2003 performance appraisal, which was not shown to plaintiff, McCracken praised plaintiff for his great understanding of property and casualty insurance and recognized his hard work in recruiting agents.  He also stated that plaintiff must really improve to survive through 2005.

McCracken did another performance appraisal of plaintiff in July 2004.  Plaintiff was recognized to be a hard worker with a vision for the district.  He was told that he needed to work toward meeting the goals for life production, conversions and the recruiting of agents.  Plaintiff's score fell in the "good" category, although Thomas thought plaintiff's score should have been lower.  No metropolitan District Sales Managers had a score above the "good" category.

McCracken and Thomas had a meeting with plaintiff regarding

9

the July 2004 performance appraisal.  Plaintiff received a copy of it.  Plaintiff was told that his district's conversion numbers needed to improve.  But, plaintiff was not told that he would be terminated if his performance did not improve.

In April 2005 Cy Winters assumed most of the responsibilities of Bob Gray and Roland Schobert.  Winters was also an employee of FBL Financial Group.  When he assumed this new role, Winters asked about the performance of District Sales Managers in Kansas.  Thomas told Winters that plaintiff was not performing his job as a District Sales Manager in a satisfactory manner.

In May 2005, Winters, Thomas and McCracken met to discuss plaintiff's performance.  Thomas believed that plaintiff should not continue in that position.  McCracken proposed that plaintiff be placed on a performance plan, rather than being asked to resign. Thomas disagreed with the performance plan option.

McCracken testified in a deposition that he was unaware of any company policy which required the preparation of a performance plan and that he prepared the plan because of his relationship with plaintiff over the years.  McCracken had not created such a plan for D.C. Couch before terminating him, although Couch was given several opportunities to correct his deficiencies.  McCracken stated that plaintiff's termination "went against the grain" of how he liked to handle such situations.

Winters decided to terminate plaintiff rather than go with the

10

performance plan.  Thomas agreed with this course of action.  On
May 20, 2005 McCracken met with plaintiff to advise him that
defendant FBM had determined to terminate his employment as a
District Sales Manager.  Plaintiff was offered the opportunity to
become an independent contractor agent.  Plaintiff felt that
opportunity would result in a drastic cut in pay and rejected the
offer.  McCracken told plaintiff that this was not the way he
wanted to handle the situation and delivered to plaintiff the
performance plan he had proposed to Thomas and Winters, but which
they rejected.

Plaintiff's employment with defendant FBM ended on June 30,
2005.

Mark Bourgeois was a District Sales Manager and employee of
defendant FBM for approximately four months from April 2006 through
July 2006.  He testified that he might have been employed by Farm
Bureau Life and/or Farm Bureau Financial Services.  His business
card said "Farm Bureau Financial Services" but he did not disagree
that he was an employee of defendant FBM.  He stated in an
affidavit that in response to his inquiry about job security in
June 2006 he was told by a supervisory officer that no one gets
fired here, you will get at least 7-8 times to correct problems
before you would be fired.  Shortly thereafter, Bourgeois was
terminated.  Bourgeois stated in his deposition that he knew that
defendant FBM could terminate his employment at any time.  During

11

negotiations for his position, Bourgeois was told by Don Thomas that he would be terminated only for cause.  But, he considered this an empty promise.

Plaintiff's understanding of the unwritten Farm Bureau policy and practice was that employees would have an opportunity to correct performance deficiencies prior to termination.  That is what plaintiff told new agents when they were employed.  That is how he would treat a secretary for defendant FBM.  The performance plan proposed by McCracken represented this unwritten policy according to plaintiff.  This understanding was based on plaintiff's experience as an independent contractor agent for many years.  Plaintiff further understood that this policy continued after the merger of "Farm Bureau" companies in 2003.  No one told him otherwise.  However, plaintiff could not name an employee who was terminated after receiving a performance plan.

Plaintiff received a probationary document from Roland Schobert for use with independent contractor agents who had performance deficiencies.  Randy McCracken developed an "Action Plan" document for certain independent contractor agents he supervised.  Cy Winters was not familiar with these documents and did not believe they were currently in use, although he admitted he was not familiar with all Farm Bureau employment policies.

Margaret "Peggy" Goe worked in human resources for "Kansas Farm Bureau" beginning in 1995.  She was involved in terminating

employees for poor performance.  She described the overall "Kansas Farm Bureau" practice as "to work with the employee to give them an opportunity to improve."  This included providing a written plan of action which outlined steps for improvement and made clear that termination would result if improvement was not made.  This procedure was used for all employees terminated for performance reasons while she was at "Farm Bureau Kansas."  During the transition period of the merger of the Kansas, Nebraska and Iowa Farm Bureau companies, Goe worked for FBL Financial Group as a Senior Human Resource Specialist II.  She testified that while employed there, she was involved in several instances where employees were terminated for performance problems.  She stated that in each instance, the procedure was the same as she had described for "Farm Bureau - Kansas," except that a template was used for consistency purposes.

Tracy Geisler was one employee of FBL Financial Group who received performance deficiency memos, which were a kind of probationary plan signed by the affected employee and a supervisor. The memos stated in part that:  "FOR THE NEXT [30 OR 90] DAYS YOU WILL MEET AND MAINTAIN THE FOLLOWING CONDITIONS TO CONTINUE EMPLOYMENT WITH FARM BUREAU."  The memos also included an at-will employment disclaimer:  "NOTHING IN THIS MEMO ALTERS THE FACT THAT I AM AN EMPLOYEE AT WILL AND MAY BE TERMINATED AT ANY TIME FOR ANY REASON."

Goe testified that she was not involved in the termination or discipline of defendant FBM employees.  She did not know defendant FBM's practice for terminating District Sales Managers, although she had no reason to believe it would be different.

Mike Sieben worked for Kansas Farm Bureau Mutual Insurance Company for several years prior to 1997.  In 1997 he worked for American Farm Bureau Insurance Services, Inc.  In 2002, he became Vice President of Crop Insurance for FBL Financial Group.  He resigned his employment there in February 2006.  Sieben has never been an employee of defendant FBM, although when he worked for FBL Financial Group he wasn't sure whether his employer was defendant FBM.  Sieben made the decision to terminate Tracy Geisler for performance deficiencies.  Before doing so, he placed her on a probationary plan.  It was his understanding that all Farm Bureau affiliates shared human resources policies and procedures.

Other uncontroverted facts may be incorporated in the later discussion of the implied contract factors in this opinion.

III.  CLAIMS OF THE PARTIES

Plaintiff claims in this case that defendant Farm Bureau Mutual Insurance Company, Inc. (FBM) and defendant Farm Bureau Life Insurance Company, Inc. (FBL) breached their implied employment contract with plaintiff because they terminated his employment without cause, and without providing plaintiff with notice of his employment deficiencies and the opportunity to correct his

14

performance.  Pretrial order, Doc. No. 46 at p. 16.  Defendants
claim that:  there was no such implied contract; that defendant FBL
was not plaintiff's employer; and that even if such an implied
contract did exist, defendants did not breach the contract.

IV.  IMPLIED CONTRACT STANDARDS

In Kansas, employees are presumptively at-will "in the absence
of an express or implied contract."  <u>Anglemyer v. Hamilton County</u>
<u>Hospital</u>, 58 F.3d 533, 537 (10th Cir. 1995).  Implied contract
claims are usually analyzed on the basis of several factors:

> Where it is alleged that an employment contract is
> one to be based upon the theory of "implied in fact,"
> the understanding and intent of the parties is to be
> ascertained from several factors which include written
> and oral negotiations, the conduct of the parties from
> the commencement of the employment relationship, the
> usages of the business, the situation and objective of
> the parties giving rise to the relationship, the nature
> of the employment, and any other circumstances
> surrounding the employment relationship which would tend
> to explain or make clear the intention of the parties at
> the time said employment commenced.

<u>Id</u>. (quoting <u>Morriss v. Coleman Co.</u>, 738 P.2d 841, 848-49 (1987)).
This summary of relevant factors has been recited in numerous
Kansas state and federal court cases involving claims of implied
employment contracts.

The intent of contracting parties is normally a question of
fact for the jury as is the determination of whether there is an
implied contract in employment.  <u>Id</u>.  But, summary judgment will be
affirmed when the facts presented to the district court are
insufficient to create a factual issue.  <u>Farthing v. City of</u>

15

Shawnee, 39 F.3d 1131, 1138 (10th Cir. 1994); Inscho v. Exide Corp.,
33 P.3d 249, 252 (Kan.App. 2001) ("a jury determination is not
always required").  In Kansas, an employee cannot create a question
for the jury by reliance on one factor alone.  O'Loughlin v. The
Pritchard Corp., 972 F.Supp. 1352, 1369 (D.Kan. 1997).  The Tenth
Circuit has held that a plaintiff claiming an implied contract for
a definite duration must introduce a personnel manual or handbook
plus some independent probative evidence bearing on the issue of
the defendant's intent in order to survive summary judgment.
Farthing, 39 F.3d at 1139.  "[S]ummary judgment is appropriate
where no material facts are in dispute and where the plaintiff
presents only evidence of his own unilateral expectations of
continued employment."  Crowley v. City of Burlingame, Kansas, 352
F.Supp.2d 1176, 1182 (D.Kan. 2005) (quoting Warren v. City of
Junction City, 176 F.Supp.2d 1118, 1126 (D.Kan. 2001)).  "A
disclaimer of contractual intent 'is not dispositive when the
record contains evidence of statements by company personnel
indicating a contrary intent.'"  O'Loughlin v. the Pritchard Corp.,
972 F.Supp. 1352, 1370 (D.Kan. 1997) (quoting Sharon v. Yellow
Freight Sys., Inc., 107 F.3d 21, 1997 WL 39483, at *2 (10th Cir.
1997)).

  V.   REVIEW OF THE RELEVANT FACTORS

       A.   Written and oral negotiations

There is no evidence in the record regarding any written or

16

oral negotiations which plaintiff engaged in with either defendant prior to becoming employed as a District Sales Manager.

B.   Usages of the business

By "usages of the business" in this case we mean practices or customs in the business of insurance.   There is no evidence of customs or practices in the business of either defendant which would shed light upon the understanding and intent of the parties regarding probationary plans or termination without just cause of a person employed as a District Sales Manager.

C.   Nature of the employment

The nature of plaintiff's employment does not tend to prove or disprove that the parties intended that plaintiff would be provided a probationary period to improve performance prior to termination or that plaintiff could be terminated without just cause.

D.   The situation and objectives of the parties giving rise to the employment relationship

The court is not aware of any situation or objective giving rise to plaintiff's employment as a District Sales Manager which would indicate that the parties intended to agree that he would be provided a probationary period to improve performance prior to termination or that he could not be terminated without good cause.

E.   Oral or written assurances of stable and continuous employment

The record does not contain evidence that plaintiff was given

17

an oral or written assurance of stable or continuous employment, or
that he would be given a probationary period in which to improve
his performance prior to being terminated.   On the other hand,
plaintiff was not warned explicitly that he (as opposed to any
other alleged at-will employee) could be terminated at any time or
faced the prospect of termination for performance reasons or
otherwise.

        F.   <u>Longevity of service</u>

    This appears to be a factor considered by the court in <u>Allegri
v. Providence-St. Margaret Health Center</u>, 684 P.2d 1031, 1036
(Kan.App. 1984), although it is not expressly listed among the
factors to be considered in the summary of relevant factors usually
referred to by Kansas federal and state courts.  Plaintiff was a
Farm Bureau employee for approximately two years before he was
terminated.   Before that, he had worked for Farm Bureau as an
independent contractor for about eighteen years.  Most of that time
was spent as an agent selling insurance.  After 2000, there were
changes in the corporate structure of Farm Bureau as a result of
the merger, and there was change, consolidation and turnover in the
position known as agency manager or market manager or District
Sales Manager in Kansas.  Considering all the circumstances, the
time span of plaintiff's career as an employee or an independent
contractor, or both, does not indicate to the court that the
parties intended that plaintiff be granted a probationary period

prior to termination or that he be terminated only upon a showing of good cause.

      G.   <u>Employee Guide and Policies and Procedures Manual</u>

    The Employee Guide which plaintiff received and reviewed when he became an employee contains a disclaimer clause on almost every page stating that it does not represent any kind of contractual commitment and that his employer's right to terminate plaintiff's employment is not limited by any contractual commitment. The Employee Guide does not contain a progressive discipline policy. It does not state that employees may only be terminated for cause. It does not provide for probationary periods or state that employees will be granted an opportunity to correct performance deficiencies. Some possible grounds for termination are mentioned. But, that is not considered persuasive grounds for finding an implied contract of employment. See <u>Kastner v. Blue Cross and Blue Shield</u>, 894 P.2d 909, 917 (Kan.App. 1995) ("[t]elling an employee about certain grounds for termination is not the same as telling an employee that he or she will not be terminated absent those grounds"). In sum, there is nothing in the Employee Guide which appears to place conditions upon the "at-will" status of employment.

    A "Policies and Procedures Manual" has been referred to in the pleadings and discovery record. This was a document which originated in 1982 and was a reference source for Farm Bureau

19

personnel, at least those in the human resources field.  The Manual contains an application form for employment which notifies applicants that they will be at-will employees and may be terminated without cause.  Doc. 81, Exhibit 6, p. 17.  The Manual states that transfer, as opposed to dismissal, should be considered for employees who are unsuited for work in a particular area, but otherwise are satisfactory employees.  Doc. 81, Exhibit 6, p. 67. The Manual states that supervisors should be sure that an employee has been counseled prior to termination and that dismissal is the only solution to the problem.  Id.  The Manual does not provide for a progressive discipline policy or for probationary plans.  It does not stipulate that employees will be given opportunities to correct performance deficiencies.  There is no evidence that plaintiff was familiar with the Policies and Procedures Manual when he was an employee at Farm Bureau.  Nor is there evidence that all supervisors were directed to follow the Policies and Procedures Manual in making decisions regarding employees.

> H.   Conduct of the parties from the commencement of the employment relationship and other circumstances surrounding the employment relationship

Most of the evidence and arguments relating to the motion for summary judgment can be placed within this catch-all category. Some of the evidence involves events before the commencement of the employment relationship and after the termination of the employment

relationship which we consider relevant only to the extent that the evidence may indicate the parties' intent or what the parties' policies and practices were during plaintiff's period of employment.

1.   <u>Statements of plaintiff's supervisors</u>

Plaintiff's supervisors never told him that he was something other than an at-will employee.  They did not promise him that he would have the opportunity to correct performance deficiencies or that he would be granted a probationary period prior to termination for performance reasons.  There was no promise of continued employment made to plaintiff.  On the other hand, plaintiff was never told that he was about to lose his job as District Sales Manager, or that he would have to correct certain deficiencies or he would lose that position.

There is no evidence that plaintiff's supervisors have told anyone else that Farm Bureau policy was breached by terminating plaintiff.  One of plaintiff's superiors, Randy McCracken, wanted to give plaintiff an opportunity to improve his performance and did not agree with the decision to terminate plaintiff.  He suggested that plaintiff be given a performance plan which provided plaintiff additional time to improve his performance or the performance of his district.  This proposal was not accepted by McCracken's superior, Cy Winters.  Instead, plaintiff was offered a transfer to a position as a career agent.  When plaintiff did not accept that

transfer to a position as an independent contractor agent, plaintiff's relationship with defendants and Farm Bureau was terminated.

2.   <u>Other supervisors</u>

Peggy Goe worked in human resources for "Kansas Farm Bureau" prior to the merger.   After the merger, she worked for FBL Financial Group.   She was not a supervisor after the merger and did not have direct knowledge of how matters were handled at defendant FBM.   However, she did hold a position in the Human Resources Department and had knowledge concerning how some employees with performance issues were handled by a Farm Bureau company which had the Management Services Agreement with defendant FBM.   She stated that prior to the merger, the practice at Farm Bureau-Kansas was to work with employees who had performance issues in an attempt to improve their performance.   This included developing an action plan which set forth how performance needed to improve.   After the merger, she believed a similar approach was used with employees at FBL Financial Group.   She made reference to a template which was used to handle such situations at FBL Financial Group.

Ms. Goe had no knowledge of plaintiff's situation and did not participate in the termination of any District Sales Managers.   Nor was she involved with terminating any employees of defendant FBM after the merger.

Mike Sieben worked in the crop insurance department of Farm

22

Bureau affiliated companies for many years.  In August 2002 he started working for FBL Financial Group, although he was not sure at that time what Farm Bureau entity employed him.  He put employees on probation when they had performance issues, such as a problem with attendance.  However, no one told him that he had to place an employee on probation prior to terminating that employee for a performance-related reason.  He testified that he did not know the policies of the company outside of the crop insurance department.

### 3.   Other District Sales Managers

D.C. Couch was a District Sales Manager who was terminated at defendant FBM prior to plaintiff's termination.  He was not given a probationary period or a probationary plan prior to his termination.  He was not told to improve or he would be fired. However, he was aware that he was not getting the job done.

Mark Bourgeois was a District Sales Manager who was both hired and terminated after plaintiff was terminated.  He was not terminated for a reason related to performance.  He testified that he was not terminated for cause.  He was told during his employment by a supervisor (but someone who did not supervise plaintiff) that "no one gets fired" and that employees were given 7 or 8 times to correct performance issues.  Prior to being hired, he was also promised by plaintiff's supervisor, Don Thomas, that he would not be fired without cause.  Bourgeois was not aware of instances in

23

which defendant FBM used probationary plans with their employees.

> 4.  <u>Plaintiff's   understanding   of   defendants'</u>
> <u>policies and practices</u>

Plaintiff's understanding of past Farm Bureau practice was that employees and agents were allowed an opportunity to correct performance deficiencies prior to termination.  He believed this was the common understanding of Farm Bureau policy.  He did not ask whether this was the policy when he decided to take the job of District Sales Manager.  No one told him that probationary plans were used as a matter of policy at that time.  He followed this policy in his dealings with agents and employees, although he never terminated an employee.  Plaintiff considered termination without notice to be reserved for employees who engaged in unethical behavior, as opposed to employees who had performance problems.

VI.  ANALYSIS

The court believes the record demonstrates that plaintiff was not an employee of defendant FBL and, therefore, summary judgment should be granted to that defendant.  Plaintiff was an employee of defendant FBM, and whether plaintiff had an implied contract with defendant FBM is the main issue on summary judgment.

The question regarding the existence of an implied contract at this stage in this case is whether a reasonable jury could find that plaintiff had an implied contract as a District Sales Manager which provided that he would have advance notice and an opportunity

to correct performance deficiencies before termination, and that he could only be terminated for good cause.  The only facts which support plaintiff's claim are a few circumstances which are at best on the fringe edges of plaintiff's employment relationship. Persons who were familiar with Farm Bureau, but were not employees of defendant FBM and did not have management authority over defendant FBM, have testified as to their common practice of alerting employees of performance deficiencies and allowing employees time to correct those deficiencies prior to termination. However, these persons were not familiar with plaintiff or with his position with defendant FBM.

The recollections of these persons were consistent with plaintiff's understanding of how Farm Bureau handled employees and independent contractor agents with performance problems.  However, as mentioned in the review of implied contract standards, plaintiff's understanding of company policy is not, in itself, evidence of an implied contract.

In addition, there is evidence that one District Sales Manager, Mark Bourgeois, was told one year after plaintiff was terminated that employees in his position had 7 or 8 times to improve their performance before they were terminated.  There is no evidence, however, that this statement reflected reality. Bourgeois was terminated without a probationary period for a nonperformance reason.  Bourgeois also thought he was terminated

without cause, although this is a disputed point.  No other District Sales Manager who was terminated was given a probationary plan or a formalized opportunity to correct his performance deficiency.

On the other hand, the Employee Guide and Policies and Procedures Manual do not support plaintiff's claims in this case. There were no written or oral statements made to plaintiff as an employee by his supervisors which substantiate his position.  There is no evidence in this case of a practice of using probationary plans with employees of defendant FBM, as opposed to other Farm Bureau entities.

When reviewing these factors, it appears to the court that the evidence supporting plaintiff's claim is less than that relied upon by courts which have found sufficient evidence to support an implied contract claim.  In Morriss v. Coleman Co., Inc., 738 P.2d 841 (Kan. 1987), the employee manual stated that employees would only be discharged for good cause and provided a procedure for disciplinary action.  A supervisor of the plaintiffs in Morriss testified that employees were only discharged for good reason and that employees were normally warned and given a chance for corrective action.

In Brown v. United Methodist Homes, 815 P.2d 72 (Kan. 1991), a personnel manual was cited which contained specific provisions for terminating employees and grounds for termination, although it

also stated that employment was at-will and employees could be terminated without cause. In addition, at trial there was testimony from the plaintiff's supervisor that the employer's policy was not to terminate without cause and incorporated the Christian philosophy of treating employees fairly. There was also testimony that the company's rules had not been followed in placing the plaintiff on leave of absence without pay.

In <u>Rice v. Wal-Mart Stores, Inc.</u>, 12 F.Supp.2d 1207 (D.Kan. 1998), the plaintiff was fired allegedly for missing work. She testified that she was told during employee orientation that her employment would be long-term and that she would be terminated only for cause. There were statements in the plaintiff's employment application indicating at-will employment. But, there were other statements in the employee manual which contradicted the employer's alleged handling of her absences. The plaintiff alleged that the absences were due to legitimate medical reasons of which the employer was notified in accordance with the employee handbook.

In <u>Koehler v. Hunter Care Centers, Inc.</u>, 6 F.Supp.2d 1237 (D.Kan. 1998), there was an employee handbook which outlined a system of progressive discipline, although it also said that employees could be terminated at will. The plaintiff also relied upon statements by plaintiff's superiors that the company's policy was to retain employees unless there was cause to terminate.

In the case at bar, there is no claim that plaintiff's

termination is contrary to the employee guide.  There is no claim that the employee guide contained a progressive discipline policy or a policy of using probationary plans for employees who had performance issues.  The Policies and Procedures Manual which has been mentioned in the evidence did not require probationary plans or opportunities to correct performance deficiencies.  It only suggested that the possibility of transfers be investigated before termination and that there be counseling.  Therefore, it is not evidence of an implied contract requiring probationary plans and time to correct performance.  Kastner, 894 P.2d at 918 (company statement expressing preference for medical or professional help, as opposed to termination, is not evidence of an implied contract requiring good cause to terminate).

In the case at bar, there is no claim that plaintiff was told by a supervisor or during an orientation that the company only terminated employees for cause or that probationary plans would be used for any employee with a performance problem or that he would be warned prior to termination.  Plaintiff relies, instead, upon his own subjective understanding of the company's policy, the practices of other employees in other departments of affiliated companies, and the statements made to a District Sales Manager after plaintiff had already been terminated.

Plaintiff's subjective understanding of his employer's policy is not sufficient to establish an implied contract.  Taylor v. Home

<u>Depot USA, Inc.</u>, 506 F.Supp.2d 504, 518-19 (D.Kan. 2007).  Nor is
a practice followed in a small number of occasions in separate
departments of affiliated companies sufficient to establish an
implied contract.  This point is also addressed in <u>Taylor</u>:

> Nor does a general practice of only firing employees
> based upon good cause constitute proof that the company
> does not maintain an at-will employment policy.  If it
> did, employers would have an incentive "to occasionally
> fire employees for no other reason than to show that they
> maintain the freedom to do so."

506 F.Supp.2d at 519 (quoting <u>Burke v. BDM Technologies, Inc.</u>, 1999
WL 40973, *3 (10th Cir., Feb. 1, 1999)).  The point is made again
in <u>Panis v. Mission Hills Bank</u>, 60 F.3d 1486, 1493 (10th Cir. 1995).
There, plaintiff based her claim of an implied contract in part
upon her participation in another employee's discharge, where she
was asked to document the discharged employee's shortcomings.  The
court held this was insufficient to establish a mutual expectation
among the parties that the plaintiff would only be terminated for
cause.  We acknowledge that plaintiff's understanding of Farm
Bureau's custom and practice is based on his long history with the
company.  Nevertheless, plaintiff's understanding of what "at-will"
employment actually meant at Farm Bureau and Farm Bureau's "general
practice" does not constitute evidence of an implied contract,
according to the above-mentioned cases.

The comments made to Mark Bourgeois are also insufficiently
probative to support a claim of an implied contract.  The comments
were made after plaintiff was terminated and obviously did not

concern plaintiff.  Therefore, they do not bear directly upon the mutual intent of plaintiff and his employer.  Secondly, the comments are in the nature of stray remarks which do little to establish the practice, custom or intent of defendants at the time plaintiff was employed.  There is no indication that the remarks represented the established policy of defendant FBM with regard to all District Sales Managers as opposed to a sales pitch or off-the-cuff comment offered to a particular person.  Since Bourgeois was terminated without warning or a probationary plan, albeit for a nonperformance reason, the authority of the remarks and their probity regarding plaintiff's situation is lacking.  Finally, even if the remarks demonstrated a general preference to permit employees a chance to improve performance, that would not be incompatible with at-will employment.  Taylor, 506 F.Supp.2d at 519 (statement in orientation guide that employer believes, where possible, associates should be given the opportunity to improve performance, is not incompatible with at-will employment statements in the same guide).

This case is like other cases where summary judgment or directed verdict has been granted against implied contract claims. In Pilcher v. Commissioners of Wyandotte County, 787 P.2d 1204 (Kan.App. 1990), testimony from the plaintiff and a former supervisor that all of the employees of the department believed they would receive three warnings before being fired, in the

30

absence of any written documentation or policy, was not enough to forestall a directed verdict.  In <u>Kastner</u>, 894 P.2d at 917-19, written statements from the employer regarding policy violations as just cause for termination, the employees' duty of good faith and fair dealing, and the preference for employees to receive professional or medical help over termination, did not create a material issue of fact as to whether an implied contract existed requiring good cause for termination.  In <u>Taylor</u>, 506 F.Supp.2d at 518-19, the court held that an employer's progressive discipline policy, written policy preference of allowing employees an opportunity to improve performance, general practice of only firing based on good cause, and comments about career opportunities and the employee remaining with the company until retirement, were not sufficient to avoid summary judgment against an implied contract claim.

In sum, the evidence in favor of an implied contract in this case is mainly plaintiff's understanding of the general practice at Farm Bureau over a long period, as corroborated by the testimony of two employees with experience in other departments. We do not believe this is sufficient to create a material issue of fact regarding whether there was an implied contract that plaintiff would be terminated only for cause or not be terminated for performance reasons without a probationary plan or an opportunity to correct the alleged deficiency.

The court shall not reach the question of whether the alleged implied contract was breached by defendant FBM's conduct.

VII. CONCLUSION

For the above-stated reasons, the court grants defendants' motion for summary judgment.

**IT IS SO ORDERED.**

Dated this 4th day of March, 2008 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge